JOY COSSICH LOBRANO, Judge.
hOn August 16, 2011, the Orleans Parish Juvenile Court adjudicated A.D.[1] delinquent as a result of having committed the crimes of armed robbery, a violation of La. R.S. 14:64, access device fraud, a violation of La. R.S. 14:70.4(B), and illegal possession of stolen things, a violation of La. R.S. 14:69. The Juvenile Court judge entered a disposition of placement with the Office of Juvenile Justice for a period not to exceed eleven months for committing armed robbery, and six months for committing access device fraud, with the sentences to run concurrently and with credit for time served. No disposition was made as to the violation of La. R.S. 14:69, relative to illegal possession of stolen things. A.D. now appeals the adjudication and disposition.
At the trial of this matter, the victim testified that on April 17, 2011, at approximately 2:00 a.m., she finished her shift as a cook at Delachaise restaurant. As she was walking to her car, she was approached by three males, one of whom she later identified as A.D. One of the other males (not A.D.) put a gun to her 12neck, and told her, “give us everything.” She handed her cell phone and wallet to A.D. Before she handed over her wallet, she asked if they wanted just her wallet or her knife bag that also contained the wallet. A.D. instructed her to hand over the wallet only. The victim testified that A.D. was not the male pointing the gun at her, but was standing behind that individual when the robbery took place. She said that after she handed over her cell phone and wallet, both the male with the gun and A.D. told her not to tell anyone or she would be killed. They both repeated several times that they knew who she was and where she lived. The three males left the scene, and the *1178 victim walked back to the restaurant to get help.
One of the items in the wallet stolen from the victim was an ATM card. Several hours after the robbery, she checked her bank account online and discovered that numerous cash withdrawals had been made after her wallet was stolen. She said that police officers who responded to her call right after the incident instructed her not to cancel her ATM or credit cards right away so . that police could track the activity in an attempt to apprehend the perpetrators. Several days later, a police detective contacted her, and asked her to come to the police station and view a lineup. The victim stated that she was able to positively identify A.D. from the lineup as one of the three perpetrators who robbed her of her wallet and cell phone. She also positively identified A.D. in the courtroom as one of the males who participated in the robbery committed against her.
NOPD Detective Jerry Baldwin testified that he investigated an armed robbery that occurred in the 1500 block of Aline Street on April 17, 2011. During lathe investigation, he obtained photos taken at an ATM machine, which showed three young black males using a card to retrieve money from the machine. Because of the apparent young age of the males and the close proximity of the ATM machine to Cohen High School, Detective Baldwin brought the photos to that high school and met with a coach/teacher familiar to him. That individual identified A.D. as one of the males in the photos.
Detective Baldwin retrieved A.D.’s personal information from the school, and contacted A.D.’s mother by telephone. He received permission to speak to A.D.’s mother in person and went to her home. After advising A.D.’s mother that he was investigating an armed robbery, Detective Baldwin showed the photos from the ATM machine to her, and she identified her son, A.D., as one of the males in the photos. At that time, Detective Baldwin advised A.D. of his rights, and relocated him to the New Orleans Police Department Juvenile Bureau.
Detective Baldwin took a taped statement from A.D. Prior to the taking of the statement, Detective Baldwin advised both A.D. and his mother of their rights. They both signed the “rights of arrestee” form, waiving their rights and agreeing to the taped interview. Detective Baldwin testified that he prepared the lineup shown to the victim, and he confirmed that she positively identified A.D. as one of the males who robbed her.
On cross-examination, Detective Baldwin stated that in one of his reports from the incident, he noted that the victim told him that the handgun used in the robbery appeared to be plastic. Both A.D. and one of A.D.’s cousins, who claimed |4he was a witness to the robbery but did not participate in it, told Detective Baldwin that A.D. did not participate in the robbery of the victim.
The next witness was Detective Nathan Magee. Detective Magee also participated in the armed robbery investigation. He assisted Detective Baldwin in taking statements, and during that process, they learned of evidence located at the residences of the other two suspects. At one of the residences, Detective Magee confiscated a black BB gun.
R.D., A.D.’s cousin, testified on behalf of the defense. He stated that he and A.D. were with the two other suspects, T.S. and R.W., on the night in question. R.D. stated that A.D. was walking behind T.S. and R.W., when suddenly, T.S. and R.W. robbed the victim. He said all four of them left the scene, went to R.W.’s house, and then went to an ATM machine where R.W. *1179 used the ATM card to obtain cash. He said R.W.’s mother also used the card to pay her phone bill. R.D. admitted he was not close enough to the gun used in the robbery to determine if it were real or fake.
A.D. testified and offered a version of events similar to that given by R.D. He stated that he and R.D. were walking behind T.S. and R.W. listening to music and chatting about a party they had attended when they saw T.S. and R.W. rob a woman after T.S. put a gun to the victim’s head. He said that he and R.D. ran off, but T.S. and R.W. ran after them and caught up with them. He testified that he had no idea that T.S. and R.W. planned to commit a robbery. He said he was shocked at what they had done, but admitted accompanying T.S. and R.W. to the ATM | smachine after the robbery. He said he helped them figure out the PIN number for the card using information obtained from the victim’s identification card in the wallet, but insisted he had nothing to do with the actual robbery. He admitted being in possession of and using the stolen ATM card more than once.
The State of Louisiana filed a petition requesting that A.D. be adjudicated delinquent for committing the crimes of armed robbery, access device fraud and illegal possession of stolen things. In the same petition, the State requested that two other males, T.S. and R.W., be adjudicated delinquent for committing the crimes of armed robbery, access device fraud and obstruction of justice. This appeal involves only the adjudication of delinquency as to A.D.
A review of the record reveals no errors patent.
In his first assignment of error, A.D. argues that the evidence presented at trial was insufficient to prove all of the elements of the offense of armed robbery. Armed robbery is defined in La. R.S. 14:64 as “the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.” A.D. specifically argues that the State did not sufficiently prove that he (or T.S. or R.W.) was armed with a dangerous weapon. In support of this argument, A.D. points to Detective Baldwin’s testimony that one of his reports taken after the incident includes a notation that the victim told him that the handgun used in the robbery appeared to be plastic. A.D. also points out that the victim was unable to ^positively identify the BB gun recovered from the residence of one of the males with A.D. on the night in question.
In State ex rel KM., 2010-0649, pp. 4-5 (La.App. 4 Cir. 9/29/10), 49 So.3d 460, 463-464, this Court set forth the standard of review in a juvenile delinquency case as follows:
In evaluating the sufficiency of evidence to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2731, 61 L.Ed.2d 560 (1979). The Jackson standard has been held to be the clear standard of review for Louisiana appellate courts by the Louisiana Supreme Court. State v. Brown, 2003-0897 (La.4/12/05), 907 So.2d 1. It specifically requires that the appellate court must determine that the evidence was sufficient to convince a rational trier of fact “that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Neal, 2000-0674, p. 9 (La.6/29/0l), 796 So.2d 649, 657, citing State v. Captville, *1180 448 So.2d 676, 678 (La.1984). This standard of review is applicable to juvenile delinquency cases. State in the Interest of T.E., 2000-1810 (La.App. 4 Cir. 4/11/01), 787 So.2d 414.
The actual production of a weapon at trial is not necessary in an armed robbery prosecution “where the state’s witnesses can establish, through their observations at the crime scene, all the elements of the charge beyond a reasonable doubt, including the existence and use of a dangerous weapon.” State v. Washington, GO-1312 (La.App. 5 Cir. 5/16/01), 788 So.2d 596, 601, citing State v. Cotton, 94-384 (La.App. 5 Cir. 11/16/94), 646 So.2d 1144, 1146. Furthermore, as stated in State v. Washington, supra, “[a] toy gun has been held to be a dangerous weapon for purposes of an armed robbery conviction if the jury finds that ‘the 17interaction between the offender and the victim created a highly charged atmosphere whereby there was a danger of serious bodily harm resulting from the victim’s fear for his life.’ ” Id., citing State v. Green, 409 So.2d 563 (La.1982); State v. Cittadino, 628 So.2d 251, 255 (La.App. 5 Cir.1993); State v. Williams, 479 So.2d 605 (La.App. 1 Cir. 1985).
According to A.D., the victim’s inability to positively identify the BB gun as the one used against her and her statement in a police report that the gun appeared to be plastic were just two of the factors demonstrating that this incident did not create a highly charged atmosphere where there was a danger of serious bodily harm resulting from the victim’s fear for her life. A.D. points to the victim’s testimony that her assailants were young and short, and stresses that the victim did not attempt to defend herself with knives in her possession, walked instead of ran back to her place of employment after the incident, and did not specifically testify that she feared for her life during the robbery.
We find no merit in A.D.’s argument. As for the victim’s inability to positively identify the BB gun retrieved during the course of this investigation, we note that when she was asked whether the gun shown to her at trial was the same one used in the robbery, she said it looked very similar to the black gun aimed at her that night, but that she had very little experience with guns and was not sure how many guns look similar to the one shown to her in the courtroom. We also point out, as did the Juvenile Court judge during trial, that the notation by Detective Baldwin in the police report stated only that the victim said the gun appeared to be plastic. The fact that the victim was not absolutely certain whether the gun pointed at her neck at 2:00 a.m. was real or fake did not make this any less of a highly charged encounter.
|sThe victim testified that one of the assailants put a gun to her neck, and told her to give them “everything.” This caused her to turn over her wallet and cell phone to her assailants, including A.D. The victim’s testimony established that this was a highly charged encounter, regardless of whether the gun used was real or fake, whether her assailants were short or tall and whether she walked or ran back to her workplace after the robbery to get help. The fact that the victim did not attempt to defend herself with one of the knives in her possession only reinforces the conclusion that the victim feared for her life when faced with a gun pointed at her that may or may not have been real. The victim did not need to specifically testify that she was in fear for her life. Her description of the incident established that fact very well. Viewing the evidence in the light most favorable to the prosecution, we conclude that the evidence in the *1181 record is sufficient to establish all of the elements of the crime of armed robbery. Items of value that belonged to the victim and were under her control were taken from her by her assailants, including A.D., through intimidation while one of the assailants was armed with a dangerous weapon.
In his second assignment of error, A.D. argues that a new disposition is warranted in this case because when the Juvenile Court judge imposed the disposition of eleven months upon A.D. for the crime of armed robbery, he was under the mistaken belief that the disposition could be amended at any time. A.D. argues that it cannot be determined whether the Juvenile Court judge would have imposed the same sentence if he had been aware that modification of the sentence was not a possibility in this case.
La. Ch.C. article 897.1(B) states:
IflAfter adjudication of a felony-grade delinquent act based upon a violation of R.S. 14:64, armed robbery, the court shall commit the child who is fourteen years of age or older at the time of the commission of the offense to the custody of the Department of Public Safety and Corrections to be confined in secure placement for the length of the term imposed by the court at the disposition hearing without benefit of parole, probation, suspension of imposition or execution of sentence, or modification of sentence.
After imposing the disposition in this case, the Juvenile Court judge addressed A.D., stating, “Let’s make note that the possibility always exist [sic] to be released early from custody if you’re doing well in custody, do you understand that?” Counsel for A.D. immediately pointed out to the judge that in this type of case, early release is not available. The trial court then repeated that the possibility for early release exists.
In the case of State ex rel. C.J., 10-1350 (La.App. 4 Cir. 2/9/11), 60 So.3d 46, this Court addressed a similar situation in which a Juvenile Court judge alluded at a disposition hearing to the possibility of a sentence being modified at a later date. In order to ensure that the Juvenile Court judge correctly understood the restrictions placed on sentencing under La. Ch.C. article 897.1(B), this Court vacated the disposition imposed, and remanded the matter to the Juvenile Court to clarify its ruling, or conduct a new disposition hearing and resentence the juvenile defendant pursuant to La. Ch.C. article 897.1(B). Id. We find that this assignment of error has merit, and will vacate the disposition at issue and remand this matter to the Juvenile Court for clarification or resentencing.
For the reasons stated above, we affirm the adjudication of delinquency against A.D. We vacate the disposition of placement with the Office of Juvenile Justice for eleven months on the armed robbery charge, and remand this matter to |inthe Juvenile Court to clarify its ruling, or conduct a new disposition hearing and resen-tence A.D. pursuant to La. Ch.C. article 897.1(B).
AFFIRMED IN PART; VACATED AND REMANDED IN PART

. Pursuant to Rules 5-1 and 5-2 of the Uniform Rules — Courts of Appeal, the initials of the juveniles involved in this matter will be used instead of their names.